**TEXASGULF, INC., Plaintiff,**

v.

**UNITED GAS PIPE LINE COMPANY, Defendant.**

**Civ. A. No. 2253–71.**

United States District Court,
District of Columbia.

June 4, 1985.

---

James J. Bierbower, John T. Miller, Jr., Washington, D.C., for plaintiff.

W. DeVier Pierson, Peter J. Levin, Paul Ryberg, Jr., Washington, D.C., for defendant.

### MEMORANDUM ON LIABILITY

GESELL, District Judge.

This diversity suit for breach of contract arises out of the failure of United Gas Pipe Line Company (United) to deliver to Texasgulf, Inc. (Texasgulf) the amount of natural gas specified under a long-term continuing supply contract. Texasgulf required the gas to operate its sulphur mine in Louisiana. Texasgulf claims substantial damages. The case is before the Court on an Amended and Supplemental Complaint after a bench trial. Proof was limited by the Court to the issue of liability and focused on the reasons underlying United's admitted failure to supply gas as required by the contract.

### I. Proceedings to Date

This case has a prolonged history. The original complaint was filed November 10, 1971, and the Amended and Supplemental Complaint, upon which this action has proceeded to trial, was filed March 23, 1982.[1]

**1.** Texasgulf's motion to further amend by adding fraud counts was denied in March 1979, on the ground that Texasgulf had not acted with the necessary diligence.

**2.** The functions of the FPC were transferred to the FERC in 1977. *See* 42 U.S.C. § 7172(a).

**3.** The three issues were:
1. Does Section 12.1 or any other of United's tariff provisions or any general or specific orders of the Commission remove or limit United's potential contract liability to Texasgulf for curtailments?
2. Would the awarding of damages to Texasgulf for United's curtailments grant Texasgulf

There have been a number of administrative and judicial actions relating to this controversy which require brief reference to put the dispute as it eventually came before the Court in proper context.

The original complaint was dismissed by the Court (Jones, J.) on January 21, 1972, on the ground that the subject matter of the controversy lay within the exclusive jurisdiction of the Federal Power Commission (FPC) and that Texasgulf had failed to exhaust its administrative remedies. This order was vacated and the action remanded on April 19, 1972. *Monsanto Company v. Federal Power Commission*, 463 F.2d 799 (D.C.Cir.1972). Judge Jones, retaining jurisdiction, then took cognizance of the agency's primary jurisdiction, where related proceedings were in progress, and stayed this case awaiting agency action.

Thereafter various hearings involving curtailment of delivery by United and certain other pipelines due to supply shortages that had developed continued before the FPC, and later before the Federal Energy Regulatory Commission (FERC).[2] Both Texasgulf and United actively participated. In April 1975, this Court vacated the stay, the case having been reassigned following Judge Jones' death. Discovery was then conducted concurrent with agency proceedings until late 1978. On February 12, 1979, the Court again stayed further court proceedings and referred three specific issues[3] to the FERC for determination under its primary jurisdiction.[4]

Subsequently, Texasgulf made several attempts to have the Court lift the stay and proceed to trial, but these were denied.

an undue preference or advantage in contravention of the Natural Gas Act?
3. What would be the effect of Section 12.3 of United's tariff upon United's potential contract liability to Texasgulf for curtailments?

**4.** The Court also at that time granted United's motion for summary judgment on Texasgulf's claims of negligent misrepresentation and breach of fiduciary duty. United's motion for summary judgment on the breach of contract claim was denied, and United's motion for summary judgment on its first counterclaim, seeking a declaration that the contract terminated in 1977, was denied and the counterclaim was

Finally, on September 14, 1982, a detailed decision was issued by the FERC Administrative Law Judge (ALJ) bringing certain basic issues in the administrative proceedings into focus for Commission decision. 20 FERC ¶ 63,070. In anticipation of trial, the Court on October 27, 1983, made further rulings in an effort to narrow issues and resolve remaining pretrial problems. But after further consideration in the light of *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412 (5th Cir.1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977), the Court reluctantly determined that trial should await definitive action by the Commission on appeals from the ALJ's decision, an appeal both United and Texasgulf were seeking to expedite.

Two years went by after the ALJ's decision, and the Commission did not make the expected decisions or take any action on the specific issues referred to it by the Court in February, 1979. With no indication when the Commission might act and in response to further urging by Texasgulf that trial should proceed, the Court over United's objection finally set aside the stay and proceeded to trial.[5]

By Orders of October 26, 1984, and December 7, 1984, the Court established an expedited trial schedule, and trial began on February 25, 1985.

The record includes an agreed series of 854 stipulated facts[6] and approximately 850 exhibits consisting of documents, pertinent judicial and administrative decisions, and excerpts from prior testimony taken under adversary conditions. Thirteen witnesses testified at trial. The parties have submitted extensive proposed findings of fact documented to the record,[7] as well as pretrial and post-trial briefs. Now after argument, the Court makes its findings of fact and reaches conclusions of law on the issue of liability as set forth below.

## II. The Gas Sales Agreement and United's Failure to Deliver

Texasgulf has mined sulphur for approximately 50 years at locations in different states. Its principal offices are in New York. It is also a small producer of natural gas at one or two gas fields.

United is a "natural gas company within the meaning of the Natural Gas Act of 1938," *United Gas Pipe Line Co.*, 3 FPC 863 (1942), operating at times relevant to this suit as a Delaware corporation with its principal offices in Louisiana. It is the second largest natural gas pipeline in the United States with a 10,250-mile pipeline system extending from the Texas coast through Louisiana, Mississippi and Alabama into the Florida panhandle. United functioned in 1967 as a wholly owned subsidiary of United Gas Corporation, which, in turn, was controlled by Pennzoil Company. As of April 1, 1968, Pennzoil merged with United Gas Corporation, thus becoming United's direct parent.

In 1967 Texasgulf undertook to extract sulphur from deposits that existed at its Bully Camp dome in the coastal marshes about 40 miles southwest of New Orleans, Louisiana. Texasgulf had used the so-called frasch process for extracting sulphur at its sulphur mines since 1919. This process depended on a continuous, uninterrupted, 365-day-a-year energy source to melt the sulphur with superheated water in underground deposits and to keep the sul-

---

stayed. United's second counterclaim was dismissed without prejudice.

5. While referral to the Commission was appropriate to give it the opportunity to rule in the first instance on matters within its technical expertise such as the scope of United's tariff, *see Nader v. Allegheny Airlines*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976), the Court's discretionary deference to the Commission in this instance threatened to become an abdication of the Court's duty to decide the case.

6. The stipulated facts will be referred to herein by their number in the Composite Statement of Admitted Facts on Liability Issues ("CS").

7. The proposed findings cover all aspects of the extensive record. They serve to elaborate all major contentions of the parties, and alternative theories as well. This Memorandum makes only such findings as are necessary to resolve liability on the basis selected by the Court.

phur in molten form after it was extracted from the ground. Extensive facilities were required. These were constructed away from the site and eventually came to rest on barges and pilings in the muck above the dome.[8]

Texasgulf considered natural gas the only practical energy source at this location. It sought a single large supplier, negotiating for natural gas first with Texaco and then with United in 1967. United prevailed as the lower bidder, obtaining the contract for Texasgulf's full requirements. United built two pipeline extensions on its system, one to Texasgulf's mine, and the other to the intercoastal storage base, both at United's expense, thus becoming, in effect, the only available gas supplier on which Texasgulf could thereafter rely to operate the mine.

United drafted the Gas Sales Agreement between the companies, undertaking to supply up to 10,100 Mcf[9] of natural gas per day to the mine over a continuous period of 20 years.[10] United was fully aware of Texasgulf's need for continuous 24-hour-a-day supply and repeatedly represented during the negotiations that it already had "a supply of gas available" and was "willing to sell and deliver" Texasgulf's full requirements. Texasgulf made

no independent investigation of United's gas reserves, relying entirely on United's representations and size.[11] Texasgulf did not bargain for or receive any commitment from United requiring that the gas originate in Louisiana or from interstate sources. CS 56.

The Gas Sales Agreement, as executed October 27, 1967, specified certain contingencies limiting United's otherwise firm commitment to deliver.

Article VIII, *Force Majeure*, contained a detailed exculpatory clause applicable to both parties, which included along with a listing of specific contingencies not applicable here "restraints of governments," and encompassed "any other causes, whether of the kind enumerated or otherwise, not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to prevent or overcome."[12]

Article IX, *Impairment of Deliveries*, provided that in the event United was unable to supply all its customers' needs, Texasgulf as an industrial customer would receive a lower priority than other customers of United who served domestic gas needs.[13]

Article XVI, *Duly Constituted Authorities*, stated:

8. Under the frasch process, water is superheated to about 330 degrees Fahrenheit under high pressure and is injected through pipes into the crystallized sulphur deposits. At the Bully Camp mine, the molten sulphur was transported after extraction by small barges to storage tanks at a shore base six miles to the north of the mine. Large barges would then transport the sulphur to Texasgulf's headquarters or to its customers for further processing. Gas heat was used for the entire process of extraction and storage until the sulphur was loaded onto the large barges, which heated with diesel fuel. Photographs of the facilities appear in PX 2, tabs 7 and 8.

9. An Mcf is 1,000 cubic feet at a standard pressure.

10. Texasgulf never took the full 10,100 Mcf per day to which it was entitled. It had a base requirement of 8,798 Mcf per day in the winter months, November through March, and 7,917 Mcf per day in the summer period, from April through October.

11. Staffa Tr. 44.

12. This article was amended also to allow Texasgulf to terminate the contract if United because of a *force majeure* "depletion of reserves or failure of wells" was unable to deliver the contracted amounts for more than 30 consecutive days or 60 cumulative days in a year. CS 44. In view of United's fault, Texasgulf never had occasion to exercise this option.

13. Article IX, *Impairment of Deliveries*, states: Buyer specifically recognizes the fact that Seller delivers gas to gas utilities for resale to domestic consumers and to public utility power plants for generation of electricity which is sold to domestic consumers. In the event a shortage of gas renders Seller unable to supply the full gas requirements of all its consumers, then it is mutually agreed that the gas requirements of gas utilities selling gas to domestic consumers and public utility power plants using gas for generation of electricity which is sold to domestic consumers shall first be supplied by Seller, and the remaining

This agreement is especially made subject to all present or future valid rules, regulations or orders of any commission or regulatory body having jurisdiction.

This clause brings into play the applicability of United's federal tariffs to the contract, a matter to be considered shortly.

United began delivering natural gas to Texasgulf's Bully Camp mine pursuant to the Gas Sales Agreement in May 1968 and subsequently met Texasgulf's requirements under the contract until November 1970,[14] when United began reducing deliveries pursuant to tariffs on file. From November 1970 through November 1971, Texasgulf limited its takes of gas to that allocated by United. From December 1971 to November 1972, Texasgulf deliberately violated its allotment and took from the pipeline the amount of gas it believed necessary to continue operating its mine. On November 22, 1972 the FPC ordered Texasgulf to obey United's curtailment and to pay back its overtakes by reducing subsequent takes below its entitlement.[15] In response to this order, Texasgulf shut down the Bully Camp mine until June 1973, when it partially reopened the mine using reduced deliveries from United supplemented by gas from other suppliers. Texasgulf again closed the mine in July 1978, at which point all deliveries of gas to the mine stopped.[16]

### III. United's Liability Is Not Excused by Its Tariff and Its Tariff Defense Must Fail If It Did Not Exercise Due Care

In view of the respective contentions of the parties, the Court will first consider the meaning and effect of United's tariffs to determine whether they provide a basis on which United's liability, if any, may be determined.

United claims that it is not liable to Texasgulf as a matter of federal law. It urges that its operations as an interstate gas pipeline have been completely preempted by the Natural Gas Act of 1938, 15 U.S.C. § 717, and that its tariffs as filed with its regulatory agency are incorporated into the Gas Sales Agreement by the Duly Constituted Authorities clause, and exonerate it completely from liability. It concedes only that it may be held at fault for failing to deliver if there was a shortage of gas caused by its own reckless or willful misconduct. United vigorously denies such conduct.

Texasgulf disputes each of these contentions. It urges that United's shortage was caused by its own mismanagement and improper conduct, making it liable as a matter of state contract law. It sharply contests United's claim of tariff protection, arguing that as a direct customer United's tariffs were inapplicable to it.

For reasons set forth below, the Court concludes that United's tariff on file when the Gas Sales Agreement was signed is applicable to Texasgulf and decisive as to United's liability. The Court further concludes as a matter of federal law that the tariff does not exonerate United from liability if its shortage of gas was caused by its own negligence.

### A. The Extent of Federal Jurisdiction Over United's System

Initially a brief description of United's system and the relation of its parts to the federal regulatory scheme is appropriate. United had essentially three distinctive segments of its system at the time of the Texasgulf contract: Texas intrastate, Louisiana "locked-in," and interstate.

available gas shall be prorated by Seller among its other consumers, including Buyer.

**14.** United experienced a brief inability to deliver to Texasgulf for five days in January 1970 due to a "peak day" shortage on United's system. A peak day on a gas pipeline is the annual day of highest demand, generally the coldest day of the year. Peak day demand can be nearly double the average day demand.

**15.** United subsequently installed a cutoff valve on the line leading to the mine to enable it to control Texasgulf's takes, which previously were entirely controlled by Texasgulf.

**16.** Appendix 10 to the Composite Statement shows United's deliveries to Texasgulf from November 1970 to July 1978. Appendix 11 shows deliveries from other producers which Texasgulf obtained beginning in June 1973.

Texas intrastate operated as a self-contained unit, buying and selling gas entirely within that state. The gas did not cross state lines. Texas state regulatory authorities had exclusive jurisdiction. Gas producers often prefer such a purely intrastate operation because it helps them get a higher price than if the gas they sell moves interstate and thereby becomes subject to FPC price control.

The interstate phase of United's system extended from Louisiana and Alabama into the Florida panhandle. The FPC exercised jurisdiction over various aspects of both the sales and the interstate transportation of gas in this operation. Sales by producers to United were subject to FPC price regulation. United's sales to resale customers, such as local gas utilities, were also price-regulated by the FPC, although sales to direct industrial customers were not.

Texasgulf's sulphur mine was attached to United's third segment, which was known by United as District 5. This system was "locked-in": it operated at lower pressure than the interstate part of United's system to which it was connected, so that gas could come into District 5 from outside but could not leave it. District 5, which was confined to south Louisiana, changed in character over the years, emerging eventually as a legally complex hybrid intrastate/interstate system. While District 5 received a grandfather certificate from the FPC in the early 1940s along with

the rest of United's system, by the mid-1940s it was operated exclusively with gas purchased in Louisiana. In 1954, United agreed with its customers and the FPC to remove those sales from FPC jurisdiction because no interstate gas was being used for them. The Louisiana Public Service Commission thereafter regulated price to resale customers on District 5.

However, beginning in 1965, United regularly sent gas into District 5 from another section of its Louisiana pipelines, known as District 6.[17] District 6 was interconnected with United's interstate system. Thus interstate gas began flowing into District 5 as of 1965. Under the law, 15 U.S.C. § 717f(c), United was required to obtain a certificate of public convenience and necessity from the FPC for this expansion of its interstate gas transportation.[18] However, it did not seek such a certificate until October 1970.[19] In 1972, the FPC ruled that the intermingling of interstate gas into District 5 starting in 1965 made District 5 subject to the Commission's jurisdiction as of 1965.[20] The Commission also issued a certificate of public convenience and necessity for District 5 effective as of 1972.[21] The effect of these rulings was to transform District 5 into part of United's interstate system for purposes of federal regulation over United's sales and deliveries to customers on District 5. However, District 5 retained its intrastate character as to sales by producers to United from fields located in District 5 because that gas was sold only within Louisiana and never left the state due to District 5's locked-in status.[22] Thus

**17.** This was accomplished basically by opening a valve between District 5 and District 6. The gas could only move into District 5, not in the reverse direction, because the pressure was lower in District 5.

**18.** Before 1963, this commingling of interstate and intrastate gas would not have submitted District 5 to FPC jurisdiction. But in a decision that year known as *Florida Parishes,* which was affirmed in 1966, the Commission found jurisdiction over commingled gas on another part of United's system in Louisiana. Opinion No. 401, 30 FPC 560 (1963), *aff'd sub nom. Louisiana Public Service Comm. v. FPC,* 359 F.2d 525 (5th Cir.), *cert. denied,* 385 U.S. 833, 87 S.Ct. 76, 17 L.Ed.2d 68 (1966).

**19.** United had prepared a draft certificate application in 1967, but its management elected not to file it for reasons that remain obscure and dubious.

**20.** *United Gas Pipe Line Co.,* Opinions 610 and 610–A, 47 FPC 245, 47 FPC 1021 (1972), *aff'd, Louisiana Power & Light Co. v. FPC,* 483 F.2d 623 (5th Cir.1973), *cert. denied,* 416 U.S. 974, 94 S.Ct. 2001, 40 L.Ed.2d 563 (1974).

**21.** *United Gas Pipe Line Co.,* Opinion 661, 50 FPC 181, 184 (1973).

**22.** The Commission rejected a motion by its staff to conduct a proceeding to exercise such jurisdiction over producers on District 5 selling to United. *United Gas Pipe Line Co.,* 10 FERC (CCH) ¶ 61,057 (1980).

producers with fields located in District 5 were still free to sell to United and avoid federal price control.

## B. The Applicability of United's Tariff

Against this background the Court turns to consider the effect of United's tariff on its liability to Texasgulf. The tariff's terms represent the only extent to which United can claim its liability is subject to federal preemption because otherwise there is no provision of the Natural Gas Act as such dealing with a pipeline's liability under its contracts with its customers.

United's service to Texasgulf's Bully Camp mine became subject to federal regulatory jurisdiction in 1965 by virtue of United's introduction of gas from interstate sources into District 5. Thus, as a matter of law and by the express terms of the Duly Constituted Authorities Article of the Gas Sales Agreement, United's tariff on file with the FPC became applicable. Indeed, in 1975, the Commission held United's tariff applicable to customers such as Texasgulf as of 1965, *United Gas Pipe Line Co.*, 54 FPC 796, 799 (1975); CS 677, 678. Since Texasgulf was a party to that proceeding and did not appeal, it is estopped from contesting the applicability of United's tariffs on file in 1965 to its Gas Sales Agreement.

In 1952, United filed a tariff governing the terms of its service, which was approved by the Commission in 1954 with some modifications.[23] This tariff has been in effect since that date. Subsequent curtailment amendments to that tariff have been filed pursuant to Commission direction[24] but these amendments have not received final approval.[25] United was bound to follow these voluntary tariff amendments upon filing but the legality of the tariffs remains "an open question." *Hercules Inc. v. FPC*, 552 F.2d 74, 87 (3d Cir.1977). Commission proceedings are still underway. Only the 1954 tariff which was in effect when United failed to deliver has been approved, and it must be applied to determine United's basic liability to Texasgulf.[26]

## C. The Meaning of the Tariff

■ Two sections of the 1954 tariff— Section 11 Force Majeure and Section 12 Impairment of Deliveries—have a direct bearing on United's obligation to deliver gas to Texasgulf.[27] Texasgulf is bound by their terms. A *force majeure* under the tariff is any cause for failure to deliver gas not within United's control, *i.e.*, "which by the exercise of due diligence" United "is unable to prevent or overcome." Section 11 provides that United is not obligated to

**23.** *United Gas Pipe Line Co.*, 11 FPC 1162 (1952); *United Gas Pipe Line Co.*, 13 FPC 398 (1954).

**24.** On April 15, 1971, the Commission notified United and other pipelines to submit for approval revised tariff sheets if curtailment was anticipated. 45 FPC 570 (1971). The Commission could have regulated the curtailments that began at that time by reviewing United's existing tariff under the power provided to the Commission by Section 5(a) of the Act, 15 U.S.C. § 717d(a). This would have provided only prospective application and could not have been implemented immediately. Accordingly, the Commission chose to process curtailment plans through the use of tariff amendments, under its power provided by sections 4(c), (d) and (e) of the Act, 15 U.S.C. §§ 717c(c), (d) and (e). *See FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 643–45, 92 S.Ct. 1827, 1839–40, 32 L.Ed.2d 369 (1972).

**25.** *See* Opinion Nos. 606 and 606–A, 46 FPC 786 and 46 FPC 1290 (1971), *aff'd in part and remanded in part, International Paper Co. v. FPC,*

476 F.2d 121 (1973); Opinion Nos. 647 and 647–A, 49 FPC 179 and 49 FPC 1211 (1973), *vacated and remanded, State of Louisiana v. FPC*, 503 F.2d 844 (5th Cir.1974); *United Gas Pipe Line Co.*, 53 FPC 742 and 53 FPC 1495 (1975), *reversed and remanded, Louisiana Power & Light Co. v. FPC*, 526 F.2d 898 (1976); *United Gas Pipe Line Co.*, 54 FPC 1934 (1975) and 21 FERC ¶ 61,016 (1982), *vacated in part and remanded in part, Mississippi Power & Light Co. v. FERC*, 724 F.2d 1197 (5th Cir.1984).

**26.** The language of the revised tariffs is essentially similar to the 1954 tariff as to exculpatory language, differing mostly as to the priorities for curtailment under Section 12, and as to a new section 12.3 providing that United would not be liable in cases of proration or interruption under section 12 to reimburse its customers for the excess cost of substitute fuels burned by the customers. CS 627.

**27.** The full text of these sections can be found in DX 118 at 89–92 and is reproduced in an appendix to this Memorandum.

supply gas to a customer such as Texasgulf during the existence of a *"force majeure"* situation if it notifies Texasgulf that a *force majeure* has occurred.[28] Section 12.1 provides that "[i]n the event a shortage of gas renders seller [United] unable to supply the full gas requirements of all of its consumers, then Seller [United], may, without liability to Buyer [Texasgulf] prorate its gas supply" as further outlined in that section. This "without liability to Buyer" phrase is omitted from the otherwise parallel provision of Article IX of the Gas Sales Agreement.

When the Commission approved this tariff in 1954 it did not interpret these provisions,[29] nor did it present any basis for removing United from contractual liability in the event of a breach of its obligation to deliver gas.

In an effort to avoid responsibility for failure to deliver gas due to its own fault, United points to the language of section 12.1 allowing it, "in the event [of] shortage," to prorate supplies "without liability." Although United recognizes that this language cannot be read literally to immunize it from liability no matter the cause of the shortage,[30] it urges that the language be interpreted broadly to exonerate it for any shortage that United did not intentionally or recklessly cause, and thus shield United from any liability unless Texasgulf can show such gross wrongdoing.[31]

United appears to contend that the due diligence standard of section 11 applies only when United declares it so applicable by announcing that it is experiencing a *force majeure* shortage.[32] This would mean that whenever United was short of gas, it could legally ignore its firm contract commitments simply by declaring a need to prorate under section 12.1, even when the shortage resulted from its lack of due diligence.

This position stands the tariff on its head and leads to a result confounding common sense. The Commission could not have meant to approve a tariff that first under section 11 placed a due diligence standard on United to meet its contractual obligations in the face of extraordinary *force majeure* events such as war, riots, storms, epidemics and earthquakes, and second under section 12.1 allowed United to escape liability for shortages entirely by prorating

---

**28.** The tariff also provides that the suspension of obligations under the contract be continued only as long as the force majeure cause continues, "and such cause shall as far as possible be remedied with all reasonable dispatch." Section 11.2.

**29.** The FPC's decision approving the tariff focused exclusively on the rate-setting aspects of the tariff as applied to United's resale customers. 13 FPC 398, 416–20 (1954). The tariff's applicability to direct-sale customers such as Texasgulf is pursuant to the Commission's curtailment jurisdiction over transportation of gas in interstate commerce, not the Commission's rate-regulating power as to resale customers. *FPC v. Louisiana Power & Light Co.,* 406 U.S. at 641–42, 92 S.Ct. at 1838–39.

**30.** *See, e.g.,* defendant's pretrial reply brief at 15.

**31.** *See* defendant's trial brief at 40–41.·

**32.** United's position on the applicability of section 11 to its curtailments has fluctuated somewhat. In its initial petition for Commission approval of its curtailment plan, filed October 26, 1970, United invoked only section 12 of the tariff as applying to and exculpating its curtail-

ment. *See* 44 FPC 1576, 1577 (1970). However, the petition described the shortage in terms sounding in *force majeure*, stating that "the current shortage is national in scope and arises from causes over which United has had no control." CS 640. United did not explicitly invoke *force majeure* until it wrote Texasgulf on January 12, 1971 advising that in addition to its previously notified reduction of deliveries under the contracts impairment of deliveries clause, it also was forced to reduce deliveries under force majeure because of cold weather problems in its suppliers' wells, compressors and other equipment. PX 307. This *force majeure* curtailment was lifted on March 4, 1971. PX 308.

In addition, United officials have testified that under a *force majeure* curtailment they would have reduced deliveries pro rata among customers affected by the *force majeure*, rather than curtailing under a priority system according to end use as United subsequently did under section 12. CS 644, 645.

However, in Phase III of the curtailment proceedings before the Commission, United argued that its curtailment qualified for exculpation under section 11 of the tariff. The administrative law judge rejected the reliance on section 11, 20 FERC ¶ 63,070 at 62,183–84, and United has not renewed the argument here.

even where proration resulted from a shortage that was caused by its own lack of due diligence.

The Court must reject this effort to read sections 11 and 12 in isolation from each other to create two contradictory fault standards. The tariff must be read as a whole.[33] When so read, it is the Court's view that the tariff creates a single exculpatory standard. That standard is one of due diligence, as stated in section 11. Under the tariff, United is excused from liability for failing to deliver gas pursuant to contract only when a gas shortage occurs that it could not by due diligence have prevented or overcome. A lack of due care constitutes a lack of due diligence.

When the tariff states in section 12.1 that in the event of a shortage United may prorate "without liability" in accord with the priorities established by the tariff, it is not establishing a separate fault standard. This language provides exculpation only from liability for the proration itself pursuant to a tariff approved by the Commission—for example, from a buyer's complaint that it should have been placed in a

higher proration priority than other buyers. Because the priority categories are to be approved by the Commission after hearings in which all buyers may participate, to allow a buyer later to claim damages for being placed in a particular category would completely undercut the validity of any Commission-approved curtailment orders. But a prerequisite for this exculpation according to the tariff is the existence of a gas shortage not caused by United's lack of due diligence.[34] This interpretation brings section 12 into harmony with section 11[35] and preserves the federal interest in continuity of supply and orderly curtailments pursuant to Commission orders.[36] This interpretation also is consistent with the observation of the U.S. Court of Appeals early in the proceedings in this case, where it noted

> [T]he industrial user may be able to say: Given the pickle created by the pipeline company, what the FPC did was lawful and proper as to actual subsequent rationing of the limited supply of gas, but the pipeline company is liable in damages because of the way it put us all in the pickle.

33. In construing the tariff, the Court is guided by the same principles of construction applicable to statutes.

It is a fundamental princip[le] of statutory construction that "'effect must be given, if possible, to every word, clause and sentence of a statute' ... so that no part will be inoperative or superfluous, void or insignificant." *In re Surface Mining Regulation Litigation*, 627 F.2d 1346, 1362 (D.C.Cir.1980). *Accord, Southern Pacific Transp. Co. v. United States*, 454 F.2d 740, 745 (Ct.Cl.1972) ("all provisions of a tariff ... are to be considered in determining the meaning to be ascribed to one provision thereof, and that meaning should be given which will give reasonable meaning to all provisions and not render a part thereof mere surplusage or create conflicts"); *National Van Lines, Inc. v. United States*, 355 F.2d 326, 332 (7th Cir.1966) (tariffs "should be interpreted to avoid unjust, absurd, or improbable results").

34. Consistent with the Court's interpretation of the tariff, Section 264 of the *Restatement (Second) of Contracts* (1981) allows discharge of the contract only where the governmental act is not the fault of the party claiming discharge. See illustration 5. *See also id.* at § 261 (compare illustrations 1 and 3; see also comments d and e defining impracticability).

35. This interpretation of the "without liability" language of section 12.1 is also consistent with similar language in section 12.2. Section 12.2 provides that United may "without liability to Buyer" interrupt service to make repairs or alterations to the pipeline or other facilities as long as such interruption is "reasonable or unavoidable." The necessity for making repairs or alterations is one of the enumerated *force majeure* conditions in section 11.1 of the tariff which United may claim as exculpatory only when it cannot prevent or overcome the condition by due diligence. In short, the "without liability" language of both sections 12.1 and 12.2 are premised on United not being at fault under the due diligence standard of section 11.

36. While United would be immune from damages for curtailment orders of the Commission where it was not at fault in bringing about the shortage on its system, a different situation may be presented where United voluntarily filed curtailment tariffs changing the order of priorities from that set out in its 1954 tariff. United could be liable for damages for such voluntary changes undertaken without Commission sanction if Texasgulf received less gas under the modified tariffs than it would have under the original tariff. This is an issue to be taken up if necessary at the damages phase of this trial.

*Monsanto Co. v. FPC,* 463 F.2d 799, 808 (D.C.Cir.1972).

Because a due diligence standard is created by United's federal tariff, it is a federal standard which becomes applicable on a uniform basis to all of United's delivery contracts, irrespective of vagaries in state law. Due diligence is a simple negligence standard of due care: it is a standard which by the tariff's terms places the burden of proof upon United to establish its own due care before it can be relieved of responsibility for gas shortage on its system.

Unlike the more lenient standard proposed by United, this standard also is consistent with public policy. "The fundamental purpose of the Natural Gas Act is to assure an *adequate and reliable* supply of gas at reasonable prices." *California v. Southland Royalty Co.,* 436 U.S. 519, 523, 98 S.Ct. 1955, 1957, 56 L.Ed.2d 505 (1978) (emphasis added). Subjecting pipelines to potentially ruinous contract liability when they were completely free from fault would not be appropriate. On the other hand, if United was relieved of liability for all but its reckless or willfully bad acts, its management would have far less incentive over the long run to provide reliable service to its customers. Thus a negligence standard strikes the appropriate balance.

■ In recent cases the Commission has rejected tariffs seeking the same broad exculpation urged here by United. *See Tennessee Gas Pipeline Co.,* 57 FPC 1593, 1604 (1977); *Lehigh Portland Cement Co. v. Florida Gas Transmission Co.,* 8 FERC

¶ 63,049 at 65,532 (1979), 13 FERC ¶ 61,041 at 61,084–85 (1980).[37] Moreover, as a general rule blanket exculpatory clauses in contracts are disfavored. *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 91, 75 S.Ct. 629, 632, 99 L.Ed. 911 (1955); *U.S. Industries, Inc. v. Blake Construction Co.,* 671 F.2d 539, 544 (D.C.Cir.1982). Such clauses in tariffs receive favor only where the regulatory body in the exercise of its primary jurisdiction expressly approves the exculpation for stated reasons consistent with its regulatory scheme. *See Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp.,* 360 U.S. 411, 420–21, 79 S.Ct. 1210, 1216, 3 L.Ed.2d 1334 (1959); *Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co.,* 372 U.S. 697, 698, 83 S.Ct. 967, 968, 10 L.Ed.2d 78 (1963) (per curiam); *cf. First Pennsylvania Bank v. Eastern Airlines,* 731 F.2d 1113, 1122 (3d Cir.1984). United has obtained no such exculpation from the Commission.

**D. Federal Regulation Does Not Preempt Damage Actions**

■ It is therefore clear that the tariff does apply as a matter of federal law and it supplants exculpatory standards of state law. *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 646, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369 (1972). However, this does not mean, as United urges, that federal control of contract terms by tariff preempts *all* state law, depriving United's customers of the right to sue for damages when gas is not delivered as contracted. *Pennzoil Co. v. FERC,* 645 F.2d 360, 385 (5th Cir.1981), *cert. denied,* 454 U.S. 1142,

---

**37.** In *Tennessee Gas,* the exculpatory tariff was approved as amended by adding "except to the extent that such curtailment of deliveries is shown to be the result of negligence or misfeasance of Seller." In *Lehigh,* the Commission refused to approve a tariff provision exonerating the pipeline in the absence of gross negligence or willful misconduct, but left open the possibility of the company refiling.

United's reliance on *Columbia Gas Transmission Corp.,* 26 FERC ¶ 61,034 (1984), is misplaced. In that case the Commission established a standard of "reckless disregard" to disqualify a pipe-

line from passing through to its customers increased gas costs. The standard there was an interpretation of specific statutory language that guaranteed pass-through except where the Commission "determines the amount paid was excessive due to fraud, abuse or similar grounds." 15 U.S.C. § 3431(c)(2). The Commission held the statutory term "abuse" to mean "reckless disregard of the pipeline's fundamental duty to provide service at the lowest, reasonable rate consistent with the maintenance of adequate service." 26 FERC ¶ 61,034 at 61,000. There is no comparable statutory language here.

102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). Federal regulation of companies like United is far from pervasive. The Commission had no control over the rates United charged Texasgulf, the prices charged United by intrastate gas producers, abandonment of service by such intrastate producers,[38] United's acquisition of gas supplies, or United's decisions to take on new customers.

Nothing in the Natural Gas Act expressly authorizes the Commission to immunize companies like United from common-law damage actions, *cf. Nader v. Allegheny Airlines*, 426 U.S. 290, 301, 96 S.Ct. 1978, 1985, 48 L.Ed.2d 643 (1976), nor has the Commission asserted such exculpatory authority here.[39] While the Commission "has plenary authority to limit or to proscribe contractual arrangements that contravene the relevant public interests," *Permian Basin Area Rate Cases*, 390 U.S. 747, 784, 88 S.Ct. 1344, 1369, 20 L.Ed.2d 312 (1968), the Commission has never found that state-law damage actions for breach of contract contravene the Act's stated purpose that gas be transported on a "just and reasonable" basis, 15 U.S.C. § 717c(a). The Act also provides that pipelines may not "subject any person to any undue prejudice or disadvantage." 15 U.S.C. § 717c(b). The Court finds that total preemption of Texasgulf's breach of contract cause of action is inconsistent with the purpose of the Natural Gas Act "to protect consumers against exploitation at the hands of natural gas companies," *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944), and to assure continuity of supply. However, federal jurisdiction does mean that the exculpatory standards of United's federal tariff apply and that damages, if any, also must be measured by a uniform federal standard.

## IV. The Nature of United's Obligation To Exercise Due Care

Since United as a certificated interstate carrier was obligated by its own tariff and by the Natural Gas Act to exercise due care in providing continuity of service, the nature of this duty must be examined before considering United's conduct.

■ United's management was required "to assure an adequate and reliable supply of gas at reasonable prices," *California v. Southland Royalty Co.*, 436 U.S. 519, 523, 98 S.Ct. 1955, 1958, 56 L.Ed.2d 505 (1978). This was its primary and persistent obligation at all times, before it contracted with Texasgulf and thereafter. It was an ever-present responsibility to be carried out in an affirmative manner with foresight and practical plans fitting the special conditions and circumstances of United's system. United's duty of due care depended on the evolving circumstances of its busi-

---

**38.** *United Gas Pipe Line Co. (Certain Producer Respondents)*, 10 FERC ¶ 61,057 at 61,134 (1980). *Cf. United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979).

**39.** In earlier proceedings before the Commission relating to United's curtailment plans, the Commission assumed that any curtailments by United pursuant to valid curtailment orders by the Commission would be immune from contract liability. The Court of Appeals for the Fifth Circuit, following the analysis in *Monsanto Co. v. FPC*, 463 F.2d 799, 808 (D.C.Cir.1972), reversed and remanded this determination as lacking substantial evidence. *International Paper Co. v. FPC*, 476 F.2d 121, 127–29 (5th Cir. 1973). Subsequent Commission decisions purporting to exculpate United completely also were reversed and remanded. *State of Louisi-*

*ana v. FPC*, 503 F.2d 844, 864–68 (5th Cir.1974); *Louisiana Power & Light Co. v. FPC*, 526 F.2d 898, 908–09 (5th Cir.1976).

The Commission subsequently found that the establishment of an equitable curtailment plan "appear[s] essentially unrelated" to whether United was guilty of negligence or willful misconduct in bringing about the shortage. *United Gas Pipe Line Co.*, 4 FERC ¶ 61,151 at 61,354 (1978). However, in the same opinion the Commission did find that the issue of "whether any of the provisions of United's tariff or any Commission orders provide United with a defense to the damage suits" was properly before it in Phase III of the still pending curtailment proceedings. *Id.* As noted previously, the Commission has not decided this issue despite long delay.

ness as it knew them or reasonably should have known them to be.

Natural gas is not available on call. Many uncertainties affect its availability for pipeline transportation. The existence of natural gas underground must be determined. Even proven sources of supply require about five years to develop on-shore, and seven or more years off-shore. United bought its gas from gas producers whose incentive to develop new supply depended on price and adequate assurance that gas, once developed and committed for sale, would be taken and not left underground. As previously noted, gas used intrastate was unregulated as to price by the Commission, but when sold interstate the producer price was controlled. Thus, availability of gas depended on a complex interplay of economic factors always operating in a competitive environment. Only a pipeline that looked well ahead, was adequately informed and pursued a definite, planned course of action could expect to achieve reliability of supply.

By the 1960s, the Commission had made it abundantly clear to all pipelines under its jurisdiction that while a pipeline entering a 20-year firm contract for continuous delivery need not have sufficient gas in reserve to fulfill the entire commitment at the outset, it was the duty of management to look well ahead and maintain a reasonable balance between its reserves and delivery obligations. All pipeline managers knew that the more a pipeline's ability to deliver appeared limited short term, the heavier its responsibility to act decisively to obtain assured sources of supply or to reduce future delivery obligations to maintain a reasonable balance for the future between its contractual commitments to obtain gas and its obligations to deliver gas.

United's management had special supply problems which affected its ability to assure continuity of service.

First, it served a wide variety of demand. United had to arrange supply for approximately 180 industrial customers, 100 distri-

bution customers and five interstate pipelines which were taking gas to serve their customers as far away as Washington, D.C.

Second, its system was complex. In 1967, United had 452 gas fields attached to its system and purchased gas from 3,200 wells under 1,152 gas purchase contracts. The daily demands on the system fluctuated widely depending on the weather and other factors, causing peak-day deliveries to be almost twice as high as the average-day delivery.

Third, because of competitive pressures and industry practice, United committed itself to deliver gas under various types of long-term firm contracts which allowed it little or no leeway to refuse gas. This was in contrast to some pipelines that had greater supply flexibility under various types of interruptible contracts or other arrangements.

Viewed in this context, United's duty of due care becomes more apparent. As a regulated pipeline, United was required by federal law to meet a high standard of care to assure continuity of delivery. It was required to confront this phase of its business with constant attention, skill and cautious planning. This duty of due care is not a static or abstract concept. Applied to its continuing obligation to balance its gas supply against the delivery demands of the system, foresight and cautious planning demanded an ever-current knowledge of United's constantly changing demand pattern and full appreciation of all factors affecting both its present and future supply prospects.

■ Thus United's obligation of due care was not satisfied by declaring general policies which were not decisively communicated in-house and closely monitored to achieve compliance. A pipeline management falls below the requisite standard of care in this regard if it ignores its own discrete mix of gas reserve holdings and delivery responsibilities and takes comfort

in decisions of others in the business who confront a different condition. In short, United was required to develop a concrete plan, be well informed at all times, and face realities decisively.

A prudent pipeline manager must also take into account that its regulators, here the FPC or FERC, may take actions that adversely affect some course of action the pipeline wishes to pursue or is pursuing. This can be either direct action, by ruling on the pipeline's proposals to expand service or increase rates to resale customers, or indirect action that affects general industry conditions.

In determining whether United satisfied this exacting, continuing duty of due care, the Court is called on to consider the proof without benefit of hindsight. The Court turns first to a review of United's supply-demand situation immediately before the Gas Sales Agreement was executed in 1967.

In this hard-fought, never-ending dispute, able counsel for the parties have advanced a multitude of alternative theories and contentions addressed to this issue. At the outset, certain of Texasgulf's theories relating to operation of District 5 designed to establish United's fault in the management of its gas supply must be rejected as too speculative and overly influenced by hindsight.

Texasgulf's expert witness, Charles Collins, constructed an elaborate hypothetical of how United could have operated District 5 in a completely different fashion beginning in the late 1950s. His purpose was to demonstrate that United would have re-tained reserves it released in the early 1960s and would have been able to avoid using any interstate gas on District 5. Extensive pipeline construction in District 5 would have been required in the 1960s. Texasgulf contends that this hypothetical operation would have allowed United to avoid any shortage on District 5 until the middle or late 1970s and urges that a prudent manager would have proceeded along these lines long before it ever contracted with Texasgulf.

The Court rejects this hypothetical scenario out of hand. It involves a series of unrealistic assumptions and questionable calculations, and finds support only in hindsight. Throughout Texasgulf's elaborate presentation, no credible evidence was presented to show that a reasonably prudent pipeline manager would have followed this course of action knowing what United knew or should have known at the time critical decisions would have to have been made.[40]

As will become clear below, this does not mean that all aspects of United's operation of District 5 are irrelevant to liability. Since it was operated in many respects as a separate system, and because it retained unique intrastate/interstate aspects, there is considerable relevant evidence focused on United's operation of District 5. But the Court's examination of United's responsibility will focus on how United actually ran District 5 as an integral part of its interstate system, not how District 5 could have been operated in a radically different way as a completely intrastate system.

Part of Texasgulf's hypothetical District 5 system involved United foregoing the use

---

**40.** Mr. Collins testified as an expert for Texasgulf in many areas. After long study of United's operations as revealed in discovery documents, filings with the Commission, testimony and public sources, he prepared numerous schedules measuring United's management of its reserves and the effects of certain actions taken by United upon its ability to deliver gas. These computations of more or less historical facts withstood close scrutiny by United and will be significantly relied on in this Memorandum. However, the Court has rejected his expert opinions con-cerning the hypothetical management of District 5. In these respects the Court has concluded that Collins lacked necessary management expertise and was using hindsight tainted by an obvious lack of impartiality. In short, he was stretched by counsel into some areas clearly beyond his competence, but this does not detract from his solid competent development of data essential to resolution of this controversy. United's motion to strike various aspects of his testimony is denied.

of the so-called swing fields. These were certain fields in south Louisiana to which United had attached both intrastate and interstate pipeline connections, and which it used to meet peak-day requirements within District 5.

An additional reason for rejecting the Texasgulf District 5 scenario is that Texasgulf incorrectly argues that United's use of swing field gas in District 5 was illegal. Texasgulf is of course correct: once gas is dedicated to interstate use, it cannot be withdrawn from interstate use without filing an application for abandonment with the Commission. But United correctly points out that at the time of its use of swing field gas in District 5, it was not established by the decisions of the Commission or of the courts whether dedication of a field to interstate use meant that it could not be simultaneously used also to meet intrastate needs, and whether that simultaneous use caused the receiving system to become jurisdictional.

United reads the Commission orders certificating District 5 as a general exculpation of its conduct relating to the certification. This is much too broad an interpretation. While those orders found that United as a practical matter needed interstate gas in District 5 as of 1965, the propriety of United's failure to seek Commission approval for that use of interstate gas until 1970 was not resolved. Indeed, the Commission strongly implied that United's conduct was unlawful. *See United Gas Pipe Line Co.*, Opinion No. 661, 50 FPC 181, 185 (1973). Texasgulf is not estopped from seeking evidentiary inferences from United's conduct in connection with its certification of District 5 as part of its general attack on United's mismanagement of its reserves.

## V. United Failed to Manage Supply and Demand On Its System With Due Care

The Court has concluded from all the evidence that in a number of significant respects, United failed to manage its system with due care and that these failings proximately caused the shortage that eventually led to United's curtailment and caused United to breach the Gas Sales Agreement.

These failings will be best brought into focus by dividing the inquiry into the events occurring immediately before United entered the Gas Sales Agreement with Texasgulf, and those that occurred afterwards leading up to the breach beginning in 1970.

## A. United Failed to Exercise Due Care in Entering the Agreement with Texasgulf

The Gas Sales Agreement between United and Texasgulf was executed on October 27, 1967. Deliveries to the Bully Camp mine began in May 1968. While the full extent of United's eventual shortage in the early 1970s could not have been reasonably foreseen at that time, United should have foreseen the strong probability that shortage on its system would promptly develop affecting continuity of service to Texasgulf by 1970. By executing a firm delivery contract and by beginning deliveries several months later without ever advising Texasgulf that it might need an alternative fuel source, United violated its duty of due care.

United did not have enough gas reserves at the time of signing the Texasgulf contract to provide Texasgulf's needs for the entire period of the contract. This in itself was not unusual. Long-term gas supply contracts are typically executed by gas pipelines knowing they are required to add new reserves to fulfill delivery obligations in later years of the contract. Given United's position in 1967, however, a number of factors—including studies on its system, general industry conditions, and its own recent experience in reserve management—should have alerted United that it could not reasonably rely on business as usual to obtain reserve for short-term needs.

### 1. United's Gas Supply Situation in the 1960s

In the early 1960s, United found itself in a difficult marketing situation, particularly in the New Orleans area. United had entered into contracts with producers in the late 1950s requiring it to take a fixed percentage of a field's known reserves or pay a penalty.[41] These take-or-pay contracts, favorable to producers, were common in the region at the time, and United had had to agree to them to obtain long-term supply commitments, even though they also had fixed price-escalation provisions.

Two problems developed in the early 1960s. First, while the cost of gas to United went up under the escalation provisions, the market price of gas went down considerably.[42] Thus United found itself paying well above market rates for its gas, which it then could not market profitably. This problem was mitigated somewhat because United could pass on some of its increased gas costs to its cost-plus customers, although not to its fixed-price customers, but United's ability to compete for new sales was particularly hurt at this time. Second, the fields to which United was attached turned out to have much greater reserves than first thought, thus increasing United's take requirement well beyond what it had anticipated. United incurred substantial take-or-pay penalties in the early 1960s[43] but began to work off these deficiency payments in 1965 and by 1970 had reduced its take-or-pay balance to zero.

To deal with the resulting financially onerous oversupply condition in the early 1960s, United stopped acquiring major new reserves from 1960 until 1966, and sought to renegotiate contracts with its major producers.

The most significant of these renegotiations was with Humble, United's biggest gas supplier. Under an agreement reached October 1, 1962, Humble agreed to lower its prices to United, and United agreed to try to take more gas.[44] Humble was given the option to withdraw its reserves from United if United did not satisfactorily increase its takes. United later reached a similar agreement with Texaco, its second largest supplier.

However, United did not increase its takes to the levels sought by these producers.[45] Humble, Texaco and others thus exercised options to withdraw reserves previously committed to United. In addition, other reserves were lost when United in 1965 advised intrastate producers in its East Bastian Bay field that it wanted to take their production interstate, thus subjecting it to the Commission's jurisdiction.

Under these contract terminations, United lost reserves totaling 4,589 Bcf by the end of 1968. As the following table shows,[46] most of this loss was incurred before deliveries began to Texasgulf.

| | |
|---|---|
| 1963 | 29 Bcf |
| 1964 | 796 Bcf |

**41.** The contracts had makeup periods of one or two years so that a penalty payment incurred one year could be erased in the subsequent two years by increasing takes proportionally. Thus penalty payments in some instances were not a total loss but amounted to a payment for gas a year or two before it was taken. In addition, United in 1962 negotiated extensions of its makeup periods in a number of its contracts.

**42.** For example, new gas purchase contract prices for interstate reserves in onshore south Louisiana fields declined from 22.8 cents per Mcf in 1960 to 18.8 cents per Mcf in 1964. CS 247.

**43.** United's take-or-pay payments reached a total of $21.2 million in 1964. Two other interstate pipelines accumulated higher take-or-pay payments—Transcontinental Gas Pipe Line Corp. had $29.3 million in 1966 and El Paso Natural Gas Co. had $53 million in 1968—but neither released gas reserves.

**44.** In 1964 and 1966, Humble and United made amendments to this agreement.

**45.** United's sales efforts were weak despite the price reductions. It also lost a major customer, Kaiser Aluminum, to Texaco.

**46.** The figures are from CS Appendix 23, Contract Terminations.

| | |
|---|---|
| 1965 | 1,593 Bcf |
| 1966 | 1,674 Bcf |
| 1967 | 363 Bcf |
| 1968 | 134 Bcf |

Of these reserves, 2,063 Bcf were lost in United's District 5 to competing pipelines, all before the Texasgulf contract. PX 8. This amounted to more than half of the reserves attached to District 5 at the end of 1962. These reserves represented 780,000 Mcf per day of deliverability, or 67 percent of United's delivery capacity in District 5 before the releases occurred. PX 217. United started adding reserves to District 5 in 1966 but by the end of 1967 had obtained only 91 Bcf, PX 23, making up only 4 percent of the losses in District 5 up to then.

United officials were unable to point to any comprehensive studies made at the time these major reserves were released of the effect of their releases on United's ability to commit in the future. Yet, as United knew, the volume of dedicated proven reserves attached to United's interstate system declined throughout the 1960s leading up to the Texasgulf contract in late 1967. The following chart shows the annual net change in reserves on the interstate system, including District 5, during that time.[47] All figures are in billion cubic feet.

| Year | Reserves Released and Withdrawals | Additions | Net Change |
|---|---|---|---|
| 1960 | 884 | 384 | —500 |
| 1961 | 841 | 47 | —794 |
| 1962 | 863 | 484 | —379 |
| 1963 | 1,692 | 131 | —1,561 |
| 1964 | 975 | 82 | —893 |
| 1965 | 1,086 | 31 | —1,055 |
| 1966 | 1,612 | 304 | —1,308 |
| 1967 | 1,552 | 617 | —935 |
| Total | 9,505 | 2,080 | —7,425 |

United renewed efforts to buy new gas reserves in 1966, but additions in 1966 and 1967 were far outnumbered by the loss of reserves in those years due to producers exercising the options previously granted by United to remove reserves from its system. Indeed, United officials testified that they were not able to buy as much gas as they wanted to in those two years and subsequently.[48] This serious difficulty should have further alerted United to the dangers of adding new major customers on firm long-term contracts in 1967.

In terms of total year-end reserves, United had 25.4 Tcf in reserves at the end of 1963, 19.4 Tcf at the end of 1966 just before entering the negotiations with Texasgulf, and about the same at the end of 1967, a 24 percent decline.[49] By comparison, 10 other interstate pipelines that were buying gas in United's supply area experienced a 13 percent increase in their reserves during the same time.

### 2. Studies of United's Deteriorating Reserves

The deteriorating reserve situation was brought forcefully to United's attention by a number of reports available to United before signing the Texasgulf agreement.

47. District 5 is included as of 1965, when it became jurisdictional. All figures are from PX 31.

48. In addition, United's gas supply vice president testified in 1965 that he was trying to buy some gas in 1964 and 1965 in Louisiana and Texas but was finding that "gas is getting kind of hard to find." PX 59.

49. These figures are from CS Appendix 33, which excludes sales to and from other pipelines in calculating both reserves and annual consumption.

Although United officials could point to no specific studies made at the time its major reserves were released in the early 1960s that assessed the effect of releasing reserves on its ability to meet further deliveries, United had available annual reports it was required to submit to the FPC, as well as routine in-house studies designed for general operating purposes. United also occasionally engaged outside consultants for special studies.

Various indexes were regularly prepared to measure United's ability to meet its market requirements. These declined along with its falling reserves. In particular, the deliverability life index,[50] which the Commission relied on as a benchmark and which until 1964 it required to be maintained at 12 years, plummeted. From 1965 to 1966, United's deliverability life fell from 16.0 years to 6.0 years. CS 569.[51]

The decline reflected in part a change in the method for measuring deliverability life. Until the 1966 report (prepared in early 1967), deliverability life was estimated by the company's gas proration department based on personal contacts by the department's employees with producers in the field. These employees had practical experience but no formal training as geologists or petroleum engineers. The new methodology was a computer-based system prepared by United's consultant, Ryder Scott Co. which used a quantified measure from certain fields known as the "back pressure curve." This system, while more precise, still relied on certain human assumptions, but one assumption of the old system—a producer in a given field will expand known reserves by further exploration within that field—was dropped because reserves in the Louisiana fields were becoming exhausted.

At the same time that Ryder Scott was informing United of declining deliverability life estimates, other studies warned of potential shortages developing quickly on United's system.

In January 1967, well before the Texas-gulf contract was signed, in a report commissioned by United's parent, Stone & Webster Service Corp. advised United that "present reserves will be able to meet annual sales requirements through 1968 when local shortages will begin to appear, first in the Houston intrastate system." It also advised that as to long-range marketing, "the most probable condition and the one on which United should predicate its long-range planning is that of a basic shortage." [52]

A 10-year operating forecast study was prepared by United in February 1967. It showed peak-day shortages would begin as soon as the winter of 1968–69, with increased shortages in later years.[53] It showed average-day deliveries would be adequate for six years.

Every fall, United prepared five-year forecasts of peak-day supply and demand. These studies, which included many volatile

---

50. Deliverability life is the number of future years in which a pipeline's system gas supply on hand can meet its annual gas requirements.

51. United's Form 15 reports filed with the Commission in the spring following each reporting year showed subsequent deliverability life as follows:

| 1967 | 6.0 years |
| 1968 | 5.0 years |
| 1969 | 4.0 years |
| 1970 | 0.0 years. |

The figures do not include Schedule 1–A future contract additions.

52. The president of United when the Stone & Webster report was completed was Mr. Parkes. He never learned of its contents. His successor, Mr. Marris, who became president before the Texasgulf contract was signed, did learn of them.

53. The study included only deliveries from producer fields, not United's storage facilities which were specifically designed to be used to meet peak-day demand. But even when possible deliveries from storage facilities were added to the calculus, the study showed significant shortfalls beginning in the winter of 1970–71.

assumptions, were used to develop annual capital spending budgets. The 1966 five-year study showed a need for new supplies in the New Orleans area in 1971–72. The 1967 study increased the estimates of needed new supplies as of 1971–72.

### 3. Industry Conditions

Besides the studies of United's system pointing to imminent shortage, general conditions in the industry also put United on notice that the days of ready access to new gas reserves were dwindling.

A 1962 report by a distinguished geologist to the National Academy of Sciences stirred controversy in the oil and gas business by predicting a natural gas shortage developing in the 1970s.

In May 1966, John J. Carter, the natural gas manager for Humble Oil & Refining Co. (Exxon), then United's largest supplier of natural gas, made a speech to the American Gas Association stating that "our remaining gas reserves are, for all practical purposes, committed...." This official went on to state that

> In the past years, pipeline expansion would often be supplied by developing reserves that had been waiting for suitable market outlets. At the present time, with the possible exception of Louisiana offshore reserves, there is a rather complete commitment of proved reserves to existing and projected pipelines and to local markets. As stated earlier, this is certainly true with Humble with no exceptions. Such being the case, future expansions of our industry must come from reserves yet to be discovered.... The proving of these [new] prospects will be extremely costly and will require more time than has been usual in the past.

In addition, as United's own expert acknowledged at trial,[54] other responsible producers were warning the Commission in 1966 and 1967 that a shortage could devel-

op if the Commission did not provide producers adequate incentives for exploration by raising wellhead prices. A vice president of Mobil Oil Co. in 1967 specifically[55] predicted a shortage developing in 1970.

Throughout the 1960s, the gas industry's ratio of reserves to production (R/P ratio), which is used as an index of annual working inventory, fell each year, both nationally and in the Gulf Coast region. Exploratory drilling also declined in the 1960s.

Although the Commission favored some reduction in reserves relative to production so that consumers would not bear the burden of paying for excessive inventories, and many in the industry did not immediately become concerned with this reserve situation, the fact remains that general industry information available to United in 1967 showed no basis for optimism regarding United's ability to add sufficient new reserves in time to prevent shortage in the short range.

### 4. United Misreported Its Reserves

United's course of conduct in its reports to the Commission indicates awareness of imminent shortage. In a variety of ways, both large and small, United reported to the Commission larger reserves than it actually had. While some of these filings were mistakes and simply illustrate lack of due care, others were deliberately calculated to place United in an unwarranted favorable light before the Commission. Taken together, these reports lead to a definite inference that United knew it was in supply trouble much earlier than it has admitted.

The Commission instituted the requirement for annual Form 15 reports in 1964,[55] at the same time that it relaxed its rigid inventory requirement of a 12-year deliverability life in favor of a flexible standard keyed to each pipeline's gas acquisition efforts. The Form 15 filings were specifically designed to give the Commission sufficient data to judge whether a pipeline's

---

54. Sweat Tr. 2068.

55. The first reports were required to be filed for the calendar year 1963.

efforts to acquire reserves warranted an individual exception to the 12-year rule. The Commission relied on the Form 15's to determine whether a pipeline had enough reserves to obtain the Commission's certificated approval to add new or enlarged service.

United's Paradis field was released to the producer, Texaco, in 1963. United's Lirette field was likewise released to the producer, Humble, in 1964. However, United's Form 15 reports for 1963, 1964 and 1965 continued to report these fields as attached to United's system. Both were major fields with reserves totaling 1,205 Bcf, and the inaccurate reporting had the effect of exaggerating United's dedicated reserves by five percent in 1964 and six percent in 1965.[56] United attributes these inaccurate reports to human error. Even if so, such a large error illustrated lack of true concern for the adequacy of its supply. The same United official who negotiated the release of these reserves signed the Form 15 reports.

More disturbing was United's use of certain assumptions in its reporting that, while not violating the letter of the Commission's reporting requirements, tended to inflate United's reserve situation and thus undermined the usefulness of the reports. In particular, United scheduled reserves as committed for long terms when in fact the reserves were under option to be withdrawn by the producers almost immediately.[57] United did not remove these reserves from its long-term commitments until after the producers withdrew them. Because large amounts of these reserves were lost from United's system in 1966 and 1967, this reflects particularly poorly on United's willingness to judge accurately whether it could meet the Texasgulf commitment based on its then current reports.

In its Form 15's, United also lumped together intrastate and interstate reserves,[58] thus producing statistics that assumed gas could cross state lines when it was legally barred from doing so. While United argues that this was informally permitted by the Commission staff, the written reporting rules did not countenance reporting intrastate reserves. In any event, United's action further undermined the validity of United's reports and suggested again its too ready willingness to deceive itself, a practice inconsistent with due care.

Contemporaneous documents show that in at least three incidents, United officials made conscious decisions to massage their statistics in order to make their reserves look better to the Commission. Although one of these incidents came after deliveries began to the Bully Camp mine, two occurred before that time.

The Commission required that a pipeline report on Schedule 1 of its Form 15 the total reserves already committed to the pipeline. It allowed pipelines optionally also to file a Schedule 1–A estimating their future short-term contract additions if the companies had traditionally used such estimates to support their deliverability projections. CS 579. United never filled out a Schedule 1–A until its deliverability life based on committed reserves plummeted in the 1966 Form 15 due to the changes in the methodology developed by Ryder Scott. In its 1966 Form 15 report, prepared in early 1967 before the Texasgulf negotiations, United reported on Schedule 1–A that it would add nearly 5.9 trillion cubic feet of

---

**56.** In terms of deliverability, the exaggeration was even greater. In the 1965 Form 15, the Lirette and Paradis reserves accounted for more than 37 percent of the deliverability for 1981.

**57.** One example was Humble's Lake Raccourci field. Beginning in 1964, Humble had an option until late 1967 to withdraw from United all reserves in the field above 25 Bcf. United's Form 15 for 1966, prepared in early 1967, showed deliveries scheduled from that field for 16 more years. Humble exercised the option that year and withdrew 213 Bcf.

**58.** Parts of the report dealing with individual fields labeled the two types of gas separately, but various indexes of deliverability combined the two together.

gas in the near future, a 30 percent addition to United's then dedicated reserves.[59] This unrealistically large estimate enabled United to increase the deliverability life reported on the 1966 Form 15 from six years to 12 years. United was advised by Ryder Scott in January 1968 that under Commission guidelines it should have claimed no more than 2.8 Tcf on the 1966 Schedule 1–A, instead of 5.9 Tcf.[60] United nonetheless continued to use the inflated figure to support its pending certificate application to supply 200,000 Mcf a day of gas to Texas Gas Transmission Corp.

In the same January 1968 meeting between United's top gas supply officials and the head of their Ryder Scott consulting team, United decided to continue reporting both intrastate and interstate reserves on the 1967 Form 15. The Ryder Scott official reported the decision in a memorandum to his boss. He explained:

> UGPL has reported both intrastate and interstate gas supply in previous Form 15 Reports even though the FPC does not require a report on intrastate gas supply. If the intrastate gas supply were omitted from the 1967 Form 15, it would give the appearance of a cut in UGPL's reserves of approximately 6 trillion cubic feet. This large apparent cut in reserves plus the fact the merger pro-

ceeding has not been completed could cause UGPL quite a bit of trouble in pending FPC proceedings.

PX 142 at 2. The merger pending was that between United and Pennzoil. The pending FPC proceeding was the sale to Texas Gas Transmission Corp.[61]

Texasgulf makes other attacks on the misleading nature of United's Form 15 reports. The Court finds most of these too trivial to be of any consequence on the liability issue. But one deserves mention. United reported each year in a summary table the new reserve additions for that year. This report consistently overstated, by a factor of sometimes 10-fold or more, the amount of new reserves added. The total overreporting for 1963 through 1966 was some 6.7 Tcf. United blames the problem on the Commission's unrealistic reporting requirements, which forced it to make "guesstimates" of data it did not have. It notes that its actual reserve additions could be accurately determined in this period by comparing the total reserves reported in one Form 15 to the total reported in the next year's Form 15. However, this does not explain why United persistently overestimated its new reserve additions year after year by such a wide margin.[62] United seemed bent on deceiving itself.

The pattern that emerges is at best one of careless insensitivity to the purpose of

59. According to United's own witness, many and perhaps most pipelines at the time would have held Schedule 1–A estimates to 10 percent or less of their then dedicated reserves. Harrell Tr. 2167. United's estimate of 30 percent was especially cavalier in light of its officials' testimony that they had no quantified goal set at the time for adding reserves.

60. PX 142, Table 1.

61. The third incident occurred in 1970, in preparation of the Form 15 for 1969. In that form, United listed as dedicated reserves more than 2.2 trillion cubic feet of gas from the Sea Robin project which at that time were potential reserves not yet proved. The Ryder Scott officials had recommended using a much smaller figure corresponding to the actual proved reserves at that time. In a memorandum before the decision was made to include the potential as well as the proved reserves, United's gas vice president wrote that such a decision "would, of

course, make Schedule 1 of the Form 15 look much better." PX 139 at 3. United contends the decision was consistent with industry practice at the time and was suggested by the FPC staff. However, the practice seems flatly contrary to the distinction drawn in the Form 15 between Schedule 1, which included dedicated reserves, and Schedule 1–A, which included future contract additions not yet committed. The inflated figures were reported on Schedule 1.

62. United was never cited by the FPC for these problems in its Form 15 reports. The only deficiency letter sent by the Commission to United dealt with certain technical problems in the 1967 Form 15 unrelated to the problems discussed above. However, the ALJ in Phase III determined that United's Form 15 reports "were not in total compliance" with Commission regulations. 20 FERC ¶ 63,070 at 65,299 (1982).

the rules to meet the FPC's mandate of assuring the reliability of gas supply by requiring public filings designed to show the adequacy of reserves.[63]

In addition, a further inference that United knew it might not be able to meet its commitments to Texasgulf arises from the misleading nature of its contract with Texasgulf.[64] United knew in 1967 that its injection of interstate gas into District 5 beginning in 1965 required it to obtain a certificate of public convenience and necessity from the Commission not only for its existing District 5 service, but a new certificate for the pipelines built to serve the Bully Camp mine. United had prepared a draft certificate application in 1967 but did not file it until the eve of its curtailments in late 1970. United's contracts which involved new certificated service always alerted the buyer to the existence of federal jurisdiction, by the inclusion of a clause making service contingent on Commission approval of an appropriate certificate. CS 40, 49. However, the Gas Sales Agreement with Texasgulf contained no such clause.[65] The significance of this omission lies in the fact that the Gas Sales Agreement contained no "without liability" language in its impairment of deliveries clause, while United's tariff then on file with the FPC contained such language. United's failure either to include the "without liability" language in the Gas Sales Agreement or alternatively to alert Texasgulf specifically to the applicability of the tariff by reference to the need to certificate the service shows that United consciously hid from Texasgulf the escape hatch that it hoped would relieve it from liability if the expected shortage developed.

The significance of United's knowledge in 1967 that it might not be able to fulfill its obligations to Texasgulf is two-fold. First, the duty of due care is measured in proportion to the risk reasonably known at the time the duty is undertaken. *See Restatement (Second) of Torts* §§ 289, 293 (1965); W. Keeton, *Prosser and Keeton on the Law of Torts* § 34 at 208–09 (5th ed. 1984). A supplier of gas like United, undertaking an obligation to provide gas where it knows the harm from shortage will be severe and where it also knows the likelihood of shortage is strong, is under a particularly high duty to prevent the foreseeable harm. Second, a supplier who knows before entering a contract that there is a significant danger of supervening events rendering performance impossible can be held to have assumed the risk of those events materializing, and the contractor's subsequent excuses will be judged more strictly by the courts. *See Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 318–19 (D.C.Cir.1966). With these principles in mind, the Court now turns to an examination of United's conduct after entering into the Gas Sales Agreement with Texasgulf.

## B. United Failed to Exercise Due Care After Entering into the Gas Sales Agreement

After United entered the Gas Sales Agreement with Texasgulf, it was not inevitable that a breach would occur in 1970. Prompt and decisive action could have cured United's negligence in entering the contract. United failed to take such action and compounded its earlier negligence by

---

**63.** United's insensitivity to its obligations continued after entering the Texasgulf contract, as shown by its filings with the Securities and Exchange Commission. A prospectus for debentures issued just before United began its system-wide curtailments in late 1970, when United knew it was facing the likelihood of curtailment, contained language assuring that United would continue to meet its system requirements for approximately 20 years.

**64.** The Court previously rejected Texasgulf's attempt to raise this misrepresentation as a separate cause of action. That was based not on the merits but on the delay in making the claim.

**65.** There is evidence that Texasgulf realized despite United's lack of candor that the sale might eventually be subject to FPC jurisdiction. But that is irrelevant to United's state of mind at the time.

adding new business, failing to acquire reserves, and unrealistically pinning all its hopes on a single offshore project.

### 1. United's Management Failed to Coordinate Sales and Reserve Efforts

Sound management to achieve a proper balance between gas delivery obligations and reserves obviously requires close coordination between sales efforts and reserve acquisitions. Given the far-flung nature of United's system, its many fields, its firm contracts for delivery, and constantly changing industry conditions, United had already reached a point by the middle of the 1960s where the "hunch" or "feel" of top executives for the situation could not be relied on and sophisticated controls were urgently needed.

United was specifically warned by Stone & Webster in the consultant's January 1967 report that it needed to better coordinate its sales and reserve acquisition efforts. The study reported:

> Generally, we found ... a high level of competence and individual effort at working levels, but a clear lack of top level coordination especially in the areas of long-range planning and customer relations. To a large extent this situation is the result of the inefficient delegation or neglect of top level responsibilities and the high centralization of operating authority. ... The rigidity and formality associated with the centralization of operating authority have resulted in indecisiveness and poor communication within the organization, have developed specialist managers with an inability to understand the problems and capabilities of other departments and have created a difficult environment for these managers in which to make long-range plans for the Company and for their own departments.

Although a new president took over United in April 1967, he and other United offi-

cials failed to follow through on these criticisms. United did not coordinate the sales and supply functions of the corporation. This is illustrated by the Texasgulf contract. The United sales representative who negotiated this long-term contract was totally unaware of United's supply situation. He represented to Texasgulf that United already had all the gas needed to meet Texasgulf's need for 10 years ahead and that if the contract went to 20 years, gas from the Sea Robin offshore project would be available. He first learned of the shortage in January 1970 from an early morning telephone call rousting him from bed to report for emergency curtailment work.

The new president, Mr. Marris, knew when he came on board that the company had insufficient reserves and that supply and demand were at best in a precarious short-term balance. He met the problem by half-way indecisive measures. Reserve acquisition was stepped up and some prospective sales were discouraged. But no clear guidelines or objectives were set out for gas buyers, and there was almost a total failure to inform sales management of impending supply difficulty. No objectives were placed in writing or quantified in any way. United had no plan. The president made piecemeal, case-by-case decisions from time to time, but due care requires far more. There was simply a failure to face the business problem squarely in the hope, but without basis for expectation, that matters would work out.

### 2. United's Expanded Service

As a result of this failure to coordinate, United took on new business after executing the Texasgulf contract that it had no reasonable expectation of being able to meet. Indeed, the new commitments were entered in the face of continued warnings about the precarious state of United's reserves.[66]

A study that United commissioned in 1967 by Arthur D. Little, Inc., which Unit-

---

**66.** The Court's conclusion that United negligently added new service after entering the contract with Texasgulf makes it unnecessary to consider two other contentions by Texasgulf.

ed received in August 1968, found that United's

reserve-to-production ratio and deliverability life are now inferior to the rest of the industry's. United's reserve position is currently substantially below both the national RP ratio and the average reserve coverage of all interstate pipelines. Its assured deliverability life is also comparatively short. As a result United's position is particularly difficult in a period in which the growth of pipelines may have to be restricted.

The report did not anticipate actual shortages but indicated that if United could not make significant acquisitions it might have to forgo new sales.

Accordingly, the report recommended that United pursue a strategy of "moderate" sales growth of 3 percent per year. United's subsequent growth exceeded even the study's definition of what a "high" growth rate would be, of 7 percent per year. Its 1969 sales were 8.7 percent above 1968 and 7.1 percent above budget. Its 1970 sales were 7.6 percent above 1969 and again over budget by 5.8 percent.

Part of this increase in sales was due to increased takes by United's pipeline customers beyond what they had estimated to United they would take, though still within contract limits.[67] Under industry conditions, however, these increased pipeline takes indicated that the reserves of other pipelines were perhaps declining. The increase was also due to United signing on new customers and expanding its contractual commitments to existing customers.

United contends this new and expanded business resulted from commitments it had made in the mid–1960s. This is misleading. United proceeded in a number of cases on the basis of informal oral agreements or written precedent agreements, where the actual Gas Sales Agreement fully committing United to the service came several years later. United thus violated its duty to satisfy its existing sales commitments before taking on new ones. *See State of Louisiana v. FPC*, 533 F.2d 1239, 1243 (D.C.Cir.1976). By choosing to honor these informal commitments when it should have known it would be unable to satisfy prior commitments such as the Texasgulf contract, United in essence was choosing to breach one set of agreements rather than another. Its decision not to breach some commitments obviously cannot shield its decision to breach others.

In particular, United expanded sales to two of its pipeline customers in the late 1960s despite continued warnings about the inadequacy of its reserves. In August 1966, United executed a precedent agreement to provide an additional 200,000 Mcf per day to Texas Gas Transmission Corp., a commitment United's staff estimated would require one trillion feet in new re-

The first of these is that United illegally diverted interstate gas into District 5 beginning in 1965 without obtaining a certificate of public convenience and necessity from the Commission, which it did not seek until 1970. The second is that United failed to report its reserves accurately to the Commission in the late 1960s in its applications for certificates of convenience and necessity. Texasgulf concludes that if the Commission had known of United's illegal service on District 5 and if it had known of the true state of United's reserves, it would not have certificated the expanded service United made.

While the factual premise of each of these arguments is well-grounded, they both rely on speculation about what the Commission would have done had United been more candid. The Court need not engage in such speculation because the arguments amount to an assertion that the Commission could and would have rescued United from its own lack of due care by preventing it from going ahead with expanded sales. That is irrelevant to United's lack of due care.

**67.** An increased take within contract limits is what is called an increase in a customer's load factor. Texasgulf contends United encouraged customers in the late 1960s to increase their load factors. The pricing structure of United's contracts made unit price cheaper as the load factor increased. United wanted to even out the load factor on its system between winter and summer months to ease its engineering difficulties in supplying gas on peak days. There is insufficient evidence to determine whether the sales force encouraged increased loads in the face of rising shortage prospects.

serves. United did not apply to the Commission for approval of the new commitment until July 1967 and did not execute the written contract for the service until July 29, 1968. There were renewed concerns at that time about the state of United's gas supplies. Specifically a study in May 1968 predicted a peak-day shortage of gas in the upcoming winter. CS 454–456.[68]

The following year a peak-day study in May 1969 also showed a potential shortage for the coming winter.[69] Nonetheless, United's president met in June 1969 with Mississippi River Transmission Corp. (MRT) and signed a precedent agreement to sell MRT an additional 51,135 Mcf per day. In May 1970, United applied for Commission approval of this sale, stating in its application that the sale "will improve the ability of United to serve its existing and prospective customers." CS 225. United in fact had already experienced a peak-day shortage the prior winter. It initiated the expanded service to MRT in November 1970, two days before beginning continuous curtailments of firm service.[70]

These service expansions also came at a time when there was increased general awareness in the industry about reserves. FPC officials began to be concerned in 1968, according to John F. O'Leary, who was then head of the Commission's Bureau of Natural Gas and who testified at trial as an expert for United.[71] By 1969, O'Leary had concluded that a shortage would come.

In May 1969, national data became available for the prior year showing that in 1968, for the first time in the 1960s, annual production exceeded additions to reserves so that national total proved reserves showed a net decline. This condition continued throughout the 1970s.

Before proceeding to consider other allegations of fault, the Court must mention evidentiary objections of United to proof on the issues just considered.

■ Texasgulf is not collaterally estopped by prior decisions of the Commission from litigating the related issues of (to use the parties' shorthand designations) knowledge date and new and enlarged service. The decisions of both the Commission and the ALJ in Phase II, on which United relies, expressly recognize that the agency was not finally determining these issues. *See Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). The ALJ's initial decision in 1977 stressed that he was making "the narrowest possible findings" and noted that "various parties to the curtailment proceeding, who are also parties to the lawsuits, waived cross-examination on the new and enlarged service issue with the understanding that this proceeding would not resolve issues being litigated elsewhere." *United Gas Pipe Line Co.*, 5 FERC ¶ 63,001 at 65,036 & 65,045 n. 93 (1977). In its Opinion No. 150 affirming the ALJ, the Commission confined its holding to the Phase II record and indicated it could change its view based on the more extensive Phase III record and the ALJ's findings therein, which had already been made but which the Commission had not yet reviewed. 21 FERC ¶ 61,016 at 61,090 n. 52 (1982). Specifically as to the knowledge date issue, Opinion No. 150 decided

---

**68.** A shortage did not in fact develop that winter because temperatures did not get as cold as the study predicted. CS 460.

**69.** These peak-day studies were keyed to whether there would be a shortage on the single day of highest system demand, but their significance went beyond that single day. United management chose to use the peak-day studies as a gauge of their ability to meet overall system demand. As shown by DX 188, peak-day demand can be almost twice as high as annual average-day demand. In the 1962–63 season,

there were 53 days where demand exceeded 110 percent of average-day demand.

**70.** Among other sales expansions at that time, United applied to the FPC in June 1970 to increase sales to Escambia Chemical Corp. by 12,000 Mcf per day. The service began just as United initiated its continuous curtailments.

**71.** Tr. 1780.

only when United officials "clearly understood" they faced a major shortage, not when they should have understood. *Id.* at 61,082. The ALJ's findings in Phase III further show the lack of finality to be attached to the Phase II findings on which United relies. In Phase III, the ALJ changed his mind on key aspects of these issues, finding that United should have been alerted to possible shortages in 1968, 20 FERC ¶ 63,070 at 65,297 (1982), and also stressing the limited and tentative nature of his conclusions: "Staff may be right that it was unreasonable of United not to recognize until the fall of 1969 that it faced a shortage and that at some point in 1967 United should have taken action to pr[e]vent or minimize a shortage, but that is not for us to decide here." *Id.* at 65,302.

United's argument that Texasgulf is making an impermissible collateral attack on the Commission's certification of United's new and expanded service also lacks merit. Texasgulf's argument here does not challenge the integrity of the Commission's holding that the public interest as of the time of its hearings in the early 1970s required issuing a certificate. *See United Gas Pipe Line Co.,* Opinion No. 661, 50 FPC 181, 184–85 (1973). The propriety of United's expansion of service in the late 1960s is the issue, an issue which the certification order did not decide.

### 3. United's Failure to Add New Reserves

United's lack of due care in adding new sales commitments in the late 1960s cannot be considered in isolation from its reserve acquisitions at the same time. United points out that its sales growth in the 1960s was roughly comparable to that of other major interstate pipelines.[72] This is correct but incomplete.

Where United deviated from other major pipelines was in the addition of reserves to keep up with its growing sales. Most pipelines in the period, as did United, showed some relative decline in reserves compared to annual sales, as reflected in the reserve to production (R/P) ratios. United's R/P ratio, however, was lower than most. In addition, other pipelines still were adding more in reserves each year than they were taking out in sales. United was one of only three major pipelines in the period 1966 to 1970 to show a decline in overall year-end reserves.

This is shown most graphically in CS Appendix 33, which compares United's annual withdrawals and year-end reserves for 1963 to 1969 with those of ten other interstate pipelines buying gas in United's supply area. Other pipelines were adding service more rapidly than United,[73] but they were increasing overall reserves while United was allowing its reserves to slide. The other pipelines had a total of 78.2 Tcf in reserves at the end of 1963 and 88.9 Tcf at the end of 1969, a 14 percent increase. United had 25.3 Tcf after 1963 and 16.4 Tcf after 1969, a 35 percent decline.[74]

United asserts that it began vigorously buying gas reserves in 1966. It is true that its additions to gas reserves began to increase that year. However, subtractions from reserves due to production and to released fields always far outstripped additions. This trend continued after the Texasgulf contract was executed. In 1968, United added 274 Bcf to its interstate and District 5 systems (excluding the Texas intrastate system) but lost 1,242 Bcf in

---

72. In 1960, United sold 1.3 Tcf of gas and all interstate pipelines sold 10.2 Tcf. In 1970, United sold 1.7 Tcf and all interstate pipelines sold 17.6 Tcf. United's additions of certificated interstate service also were in the mainstream compared to other pipelines as a percent of total sales in the late 1960s.

73. For example, the other pipelines had 41 percent more sales in 1969 than in 1965, where United had a 26 percent increase.

74. The comparison is even more stark than shown by the statistics in CS Appendix 33, because United's 1969 reserves are overstated by including 2.2 Tcf from the Sea Robin project. *See supra* note 61.

production and releases for a net loss for the year of 968 Bcf. The net loss for 1969 was 520 Bcf.[75] Compared to other major interstate pipelines, United obtained far fewer reserves in proportion to its annual production.

United failed to take advantage of its ability to pay higher intrastate prices to producers in District 5. Internal memoranda in early 1971 show that United officials were aware that they were losing sales there by failing to offer a competitive price and that one reason they were not offering a higher price was the wholly improvident reason that they did not want to pay more for reserves than they were charging to District 5 customers such as Texasgulf. United had increased competition from other pipelines for these reserves in the 1960s, a situation which was not helped by United's virtual cessation of all gas buying on District 5 from 1962 to 1968.

#### 4. United's Unreasonable Reliance on Sea Robin

The inadequacy of United's gas acquisition efforts was compounded by its unreasonable reliance on its offshore gas project known as Sea Robin.

The primary focus of United's gas acquisition program from the late 1960s on was directed at reserves in the Gulf of Mexico off Louisiana. New discoveries of gas in quantity were expected in this area located in the federal domain. There had been practically no pipeline extensions beyond Louisiana state borders prior to 1966. A novel, controversial producer-sponsored plan for gathering gas in this area known as Red Snapper was being considered by the FPC. United awaited the Commission's decision, which rejected the plan in September 1967.

United then began to evaluate a number of alternative reserve packages and possible offshore projects. A year later, Sea Robin, a joint venture between affiliates of United and Southern Natural Gas Company, was presented to the FPC. The application for a certificate of public convenience and necessity for Sea Robin was filed on August 30, 1968. It involved the largest diameter pipeline then in service to attach gas in a major producing area located a record distance offshore. FPC authorization to construct this major complex project was not issued until March 14, 1969.

Even after United experienced peak-day shortages in January 1970, it continued to rely on anticipated Sea Robin production to avoid the mounting prospects of further shortages in the near future. United finally realized later in the spring of 1970 that Sea Robin would not help with the supply problems in the immediate future. But it should have been obvious to United from the outset that its near-term foreseeable shortage could not be met by this venture. Realistically it had only long-term expectation.

The reluctance of the federal government to lease reserves in the Gulf during the 1960s, adverse weather conditions in the area, the unwillingness of producers to commit reserves if FPC prices were too consumer-oriented, construction difficulties, and environmental concerns, all of which are blamed by United for the delay in obtaining gas from Sea Robin, should have been foreseen. Thus delay well beyond the completion date target of November 1969, should have been anticipated. In fact, federal offshore lease sales did not finally occur until December, 1970, and United did not receive 100,000 Mcf per day from Sea Robin until the spring of 1971.

United's own expert testified that generally speaking there is a time lag of at least seven years between exploration of an offshore area and the time the offshore reserves become available to a pipeline. Sea Robin, an $80 million project, had no prospect of preventing shortage and curtailment near-term, and United failed to exercise due care in relying upon it to meet

75. The figures are from PX 31. The 1969 figure excludes the 2.2 Tcf attributed to Sea Robin.

needs in any substantial degree before the mid–1970s.

Moreover, it should have been apparent to United even by the time it entered into the Texasgulf contract that Sea Robin could only be of long-term benefit and that the immediate danger of shortage on the system remained. Indeed, even United's negotiators understood Sea Robin would be useful only at a much later date—the second ten years of Texasgulf's operation of the Bully Camp mine.

## VI. United's Continuing Lack of Due Care Proximately Caused the Shortage Which Caused the Breach

As the above discussion makes clear, United entered the contract with Texasgulf at its peril. United was losing reserves much faster than it was replacing them. Its management was uncoordinated. Studies warned of a potential shortage. It was careless in entering the contract. Yet without clear goals United after entering the contract simply tried to muddle through and failed.

It is impossible to calculate in hindsight with precise numbers of cubic feet how United's gas supply situation would have differed at the time United first breached the contract with Texasgulf in late 1970 had United exercised due care in managing its system up to then. But it is clear that its supply in relation to demand would have been billions of cubic feet higher. United's lack of due care thus is a substantial factor in causing the shortage on its system. That shortage caused the continuing curtailments to Texasgulf and other United customers beginning in late 1970. CS 90. The Court thus concludes that United

breached the contract by failing to deliver gas due to a shortage on its system that was proximately caused by United's lack of due care.

■ United throughout these proceedings has placed the blame for its shortage on industry-wide conditions generally and on the federal regulatory authorities specifically. Where a plaintiff has shown, as Texasgulf has here, that a defendant's breach proximately caused the plaintiff's injury, the defendant is not relieved in whole or part from liability by the existence of other contributing causes. *See Restatement (Second) of Contracts* § 346(1) (1981); 5 A. Corbin, *Corbin on Contracts* § 999 (1964). Even if there were other contributing causes of the breach, United's negligence was the primary cause.[76]

In seeking to blame the Federal Power Commission for its gas shortage, United points to its inability to anticipate certain agency rulings, the low price established for producers which stultified exploration, delays in Commission action, and failure of Commission staff to question United's practices. Putting aside United's delay in bringing changes in its system to the Commission's attention and the inexact or misleading nature of its Form 15 reports, United's disenchantment with the Commission is no excuse. Vagaries and inconsistencies in administrative action are commonplace in the history of many regulated industries. Natural gas regulation by the federal government has not followed a consistent pattern, as United well knew.[77] Moreover, there was no direct action by the Commission aimed at it of which United complains, and no totally unexpected or mercurial regulatory aberration that could possibly pro-

---

**76.** The measure of damages may be affected by subsequent impracticability that arose after United's breach by non-performance. *See Restatement (Second) of Contracts* § 254 comment b at 291 (1981); *id.* at § 347 comment e & illustration 15. But in light of the Court's findings as to United's knowledge of the risk it was undertaking at the time of executing the Gas Sales Agreement with Texasgulf, United will

have the burden of showing that it did not assume the risk of such impracticability occurring. *See id.* at § 261 comment c.

**77.** *See* M. Sanders, *The Regulation of Natural Gas, Policy and Politics, 1938–1978* at 16, 194–201 (1981).

---

vide United any relief from its own continuing need to carry out its responsibility to husband sufficient reserves to meet delivery obligations.

Indeed, United's reporting and constant representation that it had sufficient reserves may well have lulled the Commission into inaction.

The Commission left United free to manage its reserves. Even though United failed timely to seek certification from the Commission for its interstate service on District 5 to Texasgulf and other customers, the Commission approved United's eventual application and took no other action directly impeding United's ability to manage supply and demand on its system. Indeed, in 1964 the Commission expressly told gas pipelines that from then on the Commission would not exercise strict supervision over pipelines' reserves and that it would be up to the pipelines to manage their supply and demand balance.

United also tries to portray itself as merely another victim of the national gas shortage that enveloped the United States in the 1970s. But United cannot so easily lose itself in the crowd. United curtailed more service in the 1970s than any other pipeline, both in terms of gross volume and volume as a percent of sales.[78] For example, in the 1973–74 season, United curtailed 35.3 percent of its service, a total of 552 Bcf. The next highest curtailment was 213 Bcf, and the next highest as a percent of sales was 31.67 percent. In 1976–77, United curtailed 48.34 percent of its sales, or 773.9 Bcf. The next highest figures were 43.17 percent and 463 Bcf. United's curtailments also began earlier than other pipelines, and the curtailments were by no means universal. In 1972–73, United was one of 15 companies curtailing, where 23 did not curtail. In 1976–77, United was one of 31 curtailing where 19 did not curtail.[79]

United's lack of due care thus had direct and dramatic effects on its ability to deliver gas throughout the 1970s and more than any other factor led it to breach the Gas Sales Agreement with Texasgulf.

## VII. Conclusion

■ United's failure to deliver natural gas to Texasgulf in the amounts required by the terms of the Gas Sales Agreement was not caused by factors beyond United's control. United failed to supply natural gas to Texasgulf because its management did not use due care to preserve continuity of supply by maintaining a reasonable balance in the system between its available reserves and its delivery obligations. This violated United's duty as an interstate pipeline subject to the Natural Gas Act and caused it to breach its contract with Texasgulf. No provision of the Natural Gas Act, the Gas Sales Agreement, or United's tariff exonerates United for this negligent conduct, and United must respond to Texasgulf in damages, as later to be fixed by the Court in further proceedings.

## APPENDIX

Text of sections 11 and 12 of the tariff filed by United in 1952 and approved by the Commission in 1954 (from DX 118 at 89–92):

## 11. FORCE MAJEURE

11.1 *Definition of "Force Majeure"* —The term "force majeure" as employed herein shall mean acts of God, strikes, lockouts or other industrial disturbances, acts of public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of governments and people, civil disturbances, explosions, breakage or accident to machinery or lines

---

78. In 1970, the year curtailments began, one company had slightly more curtailments than United. But United surpassed it in 1971 and had more curtailments each year thereafter than any other pipeline.

79. The comparative figures are from DX 508.

APPENDIX—Continued

of pipe, the necessity for making tests, repairs or alterations to machinery or lines of pipe, freezing of wells or lines of pipe, partial or entire failure of wells, and any other causes, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to prevent or overcome; such term shall likewise include (a), in those instances where either Seller or Buyer is required to obtain servitudes, rights of way grants, permits or licenses to enable such party to fulfill its obligations hereunder, the inability of such party to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, such servitudes, rights of way grants, permits or licenses and (b), in those instances where either Seller or Buyer is required to furnish materials and supplies for the purpose of constructing or maintaining facilities or is required to secure permits or permissions from any governmental agency to enable such party to acquire, or the delays on the part of such party in acquiring, at reasonable cost, and after the exercise of reasonable digligence, such materials and supplies, permits and permissions.

11.2 *Limitations on Obligations*—In the event of either Buyer or Seller being rendered unable wholly or in part by force majeure to carry out its obligations under the Service Agreement, other than to make payments due thereunder, it is agreed that on such party giving notice and full particulars of such force majeure in writing or by telegraph to the other party as soon as possible after the occurrence of the cause relied on, then the obligations of the party giving such notice so far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused but for no longer period, and such cause shall as far as possible be remedied with all reasonable dispatch.

[The language of sections 11.1 and 11.2 has remained unchanged since 1952 and has remained part of United's effective tariff since then. CS 627.]

11.3 *Strikes and Lockouts*—The settlement of strikes or lockouts shall be entirely within the discretion of the party having the difficulty, and the above requirements that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of opposing party when such course is inadvisable in the discretion of the party having the difficulty.

## 12. IMPAIRMENT OF DELIVERIES

12.1 *Proration of Impaired Deliveries* —Seller delivers gas to (a) gas utilities, and pipe line companies which deliver gas to gas utilities, for resale to domestic and industrial consumers, (b) steam electric power plants for use in generating electricity which is sold to domestic consumers, and (c) industrial consumers. In the event a shortage of gas renders Seller unable to supply the full gas requirements of all of its consumers, then, Seller, may, without liability to Buyer prorate its gas supply in the manner hereinafter set forth after first making allowance for all gas required by Seller for the operation of any of its facilities. The gas requirements of gas utilities, and pipe line companies delivering gas to gas utilities, which sell gas to domestic consumers (but only to the extent of gas required for resale to such domestic consumers) shall first be supplied by Seller. If Seller is unable to supply gas for all the requirements of such gas utilities, and pipe line companies delivering gas to gas utilities, for resale to domestic consumers, then gas for such requirements shall be supplied ratably. In the event Seller is able to supply gas for all the requirements of such gas utilities, and pipe line companies delivering gas to gas utilities, for resale to domestic consumers, then there shall next be supplied the gas requirements of steam electric power plants using gas for the generation of electricity which is sold to domestic consumers, whether such power

APPENDIX—Continued

plants purchase their requirements from Seller or from gas utilities or from pipe line companies, purchasing their requirements from Seller; and, if Seller does not have sufficient gas to supply all of the requirements of said power plants, then said requirements shall be supplied ratably. After the above requirements have been supplied, the remaining gas supply, if any, shall be prorated by Seller among its other customers, to the extent of gas sold by them to their other consumers. In the event of any shortage of gas as in this Section provided, Buyer shall discontinue service of gas to its consumers during the period of any such shortage to the extent which may be necessary consistent to the provisions hereof.

In certain instances Seller supplies less than the full requirements of certain of its customers, and there may be times when Seller supplies less than the full requirements of Buyer hereunder and it is the intent of this Section that any priority granted hereunder shall run only to that part of the requirements of each ultimate consumer as is being currently supplied by gas furnished by Seller, directly or indirectly.

12.2 *Alteration and Repairs to Facilities*—Seller may, without liability to Buyer, interrupt its service for the purpose of making necessary alterations and repairs to its pipe lines and other facilities, but only for such time as may be reasonable or unavoidable; and Seller shall give to Buyer, except in case of an emergency, reasonable notice of its intention so to do and shall endeavor to arrange such interruptions so as to inconvenience Buyer and the other customers of Seller as little as possible. Seller shall give to Buyer reasonable notice before resuming service after the same has been interrupted and agrees that it will not resume service hereunder until after having given Buyer reasonable time after notice within which to have a representative present when gas is again turned into Buyer's lines.